Filed 8/20/21  L.W. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| L.W., <br><br>     Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF ALAMEDA COUNTY, <br><br>     Respondent; <br><br> ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>     Real Party in Interest. | A162641 <br><br> (Alameda County <br> Super. Ct. Nos. JD031935, <br> JD031936, JD031937) |

L.W. (Mother) petitions this court for extraordinary relief from dependency court orders terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26 to select a permanent plan for her sons T.P., R.P., and A.P. (collectively, Minors).[1] Mother argues that the trial court erred in finding a substantial risk of detriment to Minors if they were returned to her, and asks us to vacate the court's orders and direct the court to return Minors to her care immediately.

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

We conclude that the dependency court's findings are supported by substantial evidence, and therefore we deny Mother's petitions.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Petition and Detention*

On August 21, 2019, the Stanislaus County Community Services Agency (Stanislaus County Agency) filed a petition in Stanislaus County Superior Court under section 300, stating that Mother's children N.W., J.R., T.P., R.P., and A.P. (then ages 13, 7, 5, 4, and 2, respectively) had been temporarily detained two days earlier.[2] The petition alleged Mother's failure or inability to adequately supervise or protect the children (§ 300, subd. (b)(1)) and also alleged that Mother was unable or unwilling to provide or arrange for the children's care. (§ 300, subd. (g))

The petition alleged that on August 15, 2019, R.P. and two other children were seen swimming unsupervised in the pool at a Fairfield apartment complex. R.P., then 4 years old, began drowning and was pulled out by a bystander; Mother was not present. On August 16, 2019, the children were again seen at the pool unsupervised. R.P. again nearly drowned and again was pulled from the pool by a bystander. This time R.P. appeared blue; chest compressions were administered; and he was taken to the hospital. Fairfield police located Mother and reported that she was

---

[2] Case number JD031935 pertains to T.P., JD031936 to R.P., and JD031937 to A.P. Mother has a total of seven children. N.W. and J.R., both girls, were detained with Minors but are not subjects of Mother's writ petition; we refer to them to provide information that sheds light on the cases of T.P., R.P., and A.P. A sixth child, age 11 in August 2019, did not live with Mother at the time of the incident that led to detention and does not figure in the case at all. Mother's youngest child was born in August 2020 while Minors' cases were pending. That child has apparently remained with Mother and has not been a dependent of the juvenile court.

uncooperative and did not provide them with any information. That day, Mother was arrested for a violation of Penal Code section 273a, subdivision (a), Child cruelty: Possible injury/death.[3] On August 17, 2019, Mother reported smoking marijuana; the children reported that two days earlier, A.P., then 2 years old, was drowning when a man pulled him out of the pool, and that Mother was not at the pool that day; and J.R., then 7 years old, reported that she had nearly drowned twice, but someone grabbed her arm and she was able to get to the stairs. The petition alleged that the whereabouts of the children's alleged fathers were unknown.[4]

The Stanislaus County Agency prepared a detention report in advance of a hearing scheduled for August 22, 2019. According to N.W., the family had been living in Modesto, but they had been staying with a relative for a few days until they found a new place to live. Mother told a social worker that although she had not been at the pool on August 15, she was there on August 16. She said when they arrived at the pool on August 16, she sat in her car while the children were lined up at the pool gate. The apartment manager told her the children would not go into the pool area without an adult, so Mother turned off the car and went into the area with the children, who, Mother said, do not know how to swim. After about an hour, when they were getting ready to leave and the children were out of the pool, Mother took A.P. and a cousin to the car, leaving 13-year-old N.W. to supervise the other children in gathering their things. Mother reported that while N.W. had her head turned away from the children because she was using an inhaler, someone pushed R.P. into the pool.

---

[3] The criminal matter remains pending.

[4] The whereabouts of Minors' alleged father remained unknown throughout the proceedings. We do not mention him further.

According to the detention report, 17 different reports had been received by three separate counties from 2009 to 2017 alleging general neglect, physical abuse, or emotional abuse by Mother. Six of the referrals were "evaluated out," four were considered "inconclusive," and seven were deemed "unfounded." Among the reports identified as "inconclusive" were allegations that Mother did not have proper medication for a child suffering from uncontrolled asthma, and that at age 11 N.W. was left alone to supervise siblings then aged 4, 3, and 2, as well as a 2-week-old newborn.

On August 26, 2019, the Stanislaus County court issued orders of detention.

B.  *Jurisdiction and Disposition – October 2019 through Early 2020*

In a report prepared for an October 3, 2019 jurisdiction hearing, the Stanislaus County Agency stated that as of September 30, it had not heard from Mother, although she had been released from jail and had been in contact with the relatives with whom the children had been placed. Mother was not engaging in services or visiting with the children. In orders dated October 9, 2019, the Stanislaus County court found the allegations of the petition true and determined that the children were described by section 300, subdivisions (b)(1) and (g).[5]

In a disposition report and addendum report prepared for a December 2019 hearing as to N.W. and Minors, the Stanislaus County Agency

---

[5] The court ordered the matter transferred to Solano County, where the family resided with relatives before the children were detained and where the children had been placed with relatives. Although transfer was accepted for all the children, the matter was transferred back to Stanislaus County for N.W. and Minors in the absence of any legal address in Solano County for Mother or the children's fathers. J.R.'s dependency case, however, remained in Solano County. In August 2020, the court granted full custody of J.R. to her father and dismissed J.R.'s case.

4

recommended that the matter be transferred to Alameda County, where Mother was currently residing, and that reunification services be ordered. According to the report, Mother was enrolled in a parenting program through the North Bay Regional Center, which was assisting her with housing services. Mother did not understand why the children were removed from her care and why she was arrested for an accident, which, she said, "could have happened to anyone." A visit between Minors and Mother occurred in November 2019 and went well, according to the person who supervised the visit.

On December 5, 2019, the court ordered reunification services for Mother, which included a parenting class, Child and Family Team meetings, and weekly visitation with Minors and N.W. The court also ordered the matter transferred to Alameda County.

The Alameda County Social Services Agency (the Agency) prepared an acceptance of transfer report in January 2020 and an addendum report in February 2020. In late January, Mother informed the agency that she was about to begin a new job, she would begin parenting classes in February, that she wanted to get her children back, and she would need a housing referral. Minors' caregiver reported that she had taken Minors to the doctor in late January; T.P. was up to date on immunizations but R.P. and A.P. were not. T.P. and R.P. had multiple cavities and needed extensive dental work including crowns and extractions for T.P.

The Alameda County court accepted transfer and set a six-month review hearing for May 2020.

C.   *Six-Month Review – May 2020*

In the status review report prepared for the May 2020 hearing, the agency reported that a few months earlier, in February, Minors and N.W. had

been placed with K.J., a non-relative extended family member. The Agency recommended that Minors and N.W. remain in out-of-home placement and Mother continue receiving reunification services, and reported that Mother agreed with the recommendations.

The report stated that in 2001, Mother, who has an intellectual disability, was determined to be eligible for the services of the Regional Center. The Agency reported that a case manager at the North Bay Regional Center stated that Mother has a "significant and substantial developmental disorder of mild intellectual disability." Reports from Le Blanc Consulting (Le Blanc), which teaches independent living and parenting skills to people with developmental disabilities and which provided services to Mother on behalf of the Regional Center, state that Mother had been diagnosed with "Moderate Intellectual Disability."

Mother was receiving 35 hours per month of independent living skills services to assist her in meeting her "daily needs (health and medical, home training skills, social skills)." Mother's service provider, Ms. Ward from Le Blanc, reported working with Mother to increase Mother's ability to become organized and manage communication with multiple providers in order to support the well-being of herself and her children. The Agency stated that Mother appeared "overwhelmed" with the number of service providers working with her family, which "often causes her to be non-responsive for periods of time."

Mother was also receiving 20 hours per month of parenting support to assist in areas including discipline and behavior management, time management, the children's educational, medical and health needs, child development and child safety.

Mother reported to the Agency that she had recently lost her job because of the status of her pending criminal case (that is, the case brought under Penal Code section 273a, subdivision (a)), and that she was looking for stable employment and housing. Mother had engaged in in-person parenting classes during February 2020, but had difficulty maintaining her participation because of her employment obligations. Ms. Ward reported that Mother would benefit from consistent participation in the program, and that until shelter-in-place restrictions were lifted, mother was expected to participate in weekly Zoom parent groups.

In February 2020, Mother had visits with Minors and N.W. twice a week for at least two hours per visit. The children's caretaker, K.J., who supervised the visits, reported that although Mother responded appropriately to the children's needs, she could benefit from support to ensure that she could understand their developmental and supervision needs. Mothers' work schedule had apparently prevented visitation in early March 2020; then, after shelter-in-place restrictions took effect in mid-March, Mother and the children had telephone contact at least once a week.

The Agency stated that N.W., age 14, presented as "independent and parentified." T.P., age 6, presented as "an active, high energy and explorative" child. R.P., age 5, presented as "hyperactive" and "interested in exploring new experiences/games." A.P., age 3, was described as a "very active" child who "enjoys high energy activities." The Agency reported that N.W. had expressed concerns that returning to Mother's care would mean that she would have to watch her siblings "all the time," and that she was worried that something "bad" would happen to her siblings if she is responsible for caring for them by herself. The Agency reported, "It appears that [N.W.] and [T.P.] did not attend school regularly while in the care of

7

their mother," and that as a result they were experiencing academic difficulties.

An updated case plan was prepared in light of a Child and Family Team meeting held in mid-May. The plan identified three goals for Mother: identify, apply for, and obtain suitable housing for her and her children; demonstrate the ability to independently organize, supervise and arrange the physical space to ensure the children's needs are met, with appropriate age-related expectations; and demonstrate the ability to use her support network weekly to help with the supervision needs of the children.

At the six-month review hearing, the court found that Mother had made "minimal" progress toward alleviating or mitigating the causes requiring placement, and that out-of-home placement continued to be necessary and appropriate. The court ordered continued reunification services and gave the Agency discretion to allow unsupervised visits between Mother and the children. A further review hearing was scheduled for September 2020.

D.    *Twelve-Month Review – September 2020*

In the status review report prepared for the September 2020 hearing, the Agency reported that Minors and N.W. continued to live in the home of K.J. The Agency recommended that Minors and N.W. remain in out-of-home placement and that Mother continue receiving reunification services. The Agency reported that Mother agreed with the recommendations.

According to the report, in late August 2020 Mother moved into a two-bedroom apartment in the complex where the children were living with K.J., and the social worker had made a referral for financial support towards her move-in costs. Mother had increased her level of participation in services

8

provided by the Regional Center to support her independent living and parenting support needs.

Mother was receiving 35 hours per month of independent living services and had increased her level of consistent communication with the Regional Center providers. In-home services were to resume at the end of September. Ms. Ward (from Le Blanc) would meet with Mother twice weekly and help her create and maintain a monthly budget, which would assist her in maintaining stable housing.

Ms. Ward described Mother's participation in twice-weekly virtual parenting classes during the reporting period as consistent and fully engaged. The classes covered budget and finance, parenting tips, and developmental milestones. Mother remained eligible for 20 hours of parenting support per month, and in-home services, as with independent living skills, were to resume at the end of September. Ms. Ward was to meet Mother twice per week and work with her "to develop a safety plan regarding visitation and strategies to meet the [children's] emotional and academic needs during increased visitation."

Mother had supervised visitation with Minors and N.W. from May through July 2020; K.J., the non-relative extended family member with whom the children were living, supervised the visits. K.J. reported that they went well overall. K.J. said she provided advice to Mother on how to supervise all three Minors at the same time, and that Mother was initially resistant to accepting the advice but became more receptive. Unsupervised visits in K.J.'s home began in early August. In early September 2020, the unsupervised visits moved to Mother's home. The Agency was informed that N.W. might have been asked to supervise Mother's newborn baby during one of the visits; Mother denied the claim.

The Agency expressed concern that Mother had not progressed to overnight visitation or shown that she could ensure that Minors and N.W. would always be cared for and supervised by a responsible adult. Mother reportedly appeared fixated on the lack of supervision regarding the drowning incident, instead of on the need to support the children's safety and well-being in all settings, including her home. The Agency was concerned that Mother had not been able to involve the people she had identified as her support network, beyond K.J. and Ms. Ward, in Child and Family Team meetings or communicate with them about the children's needs.

Mother's case plan was updated in light of a Child and Family Team meeting that was held by phone in mid-September and attended by the social worker, Mother, and K.J. The updated plan identified two overall goals: Mother would demonstrate the ability to use her support network weekly to assist in the supervision of the children, and demonstrate that she can meet the children's needs, including supervision, during visitation.

At the 12-month review hearing, the court found that Mother had made "partial" progress toward alleviating or mitigating the causes requiring placement. The court maintained the children's out-of-home placement and ordered continued reunification services. The Agency was granted discretion to increase unsupervised visits "up to and including a trial visit" in Mother's home, with three days' notice to the children's counsel. A further status review hearing was set for February 2021.

E.    *Eighteen-Month Review and Contested Hearing*

    1.    *Status Report filed February 2, 2021*

In the status report prepared for the February 2021 hearing, the Agency recommended that Minors and N.W. remain in out-of-home placement, that reunification services to Mother be terminated, and that a

10

section 366.26 hearing be set with the permanent plan of legal guardianship with K.J., with whom the children had been living for the past year. Mother disagreed with the recommendations, and wanted the children returned to her care.

Mother told the Agency that J.R. (who was then age 8 and whose dependency case had been dismissed) was living with her. Mother informed the Agency that J.R.'s father, who had full custody, had requested the arrangement.[6]

According to the Agency's report, Mother was no longer receiving unemployment benefits but had completed an application for other financial assistance. Mother was apparently behind on her rent, and although the social worker had requested that Mother sign a consent-to-release form so the agency could consult with the property management company, Mother had not yet signed one.

N.W. and Minors had unsupervised visits with Mother at her home three days a week, for up to four hours per visit. There were also at least two unauthorized overnight visits. Mother initially denied that the overnight visits had occurred, but later said she was not aware that overnight visits required approval. The children's caregiver, K.J., informed the agency that although she was aware that overnight visits required approval, she and

---

[6] J.R.'s father subsequently told the Agency that he had arranged for J.R. to visit with Mother weekly to support his work schedule and had not arranged for her to live permanently with Mother. He reported that it was difficult maintaining remote school learning when J.R. is with Mother: the background would be loud when J.R. logged on the computer, or J.R. would not log on consistently. J.R.'s father stated that although he had no concern about J.R. visiting with Mother, his family members have expressed concern about Mother's ability to meet J.R.'s needs.

Mother were "living in the same apartment complex," and she was trying to avoid "verbal disagreements" with Mother.

During a visit in October 2020 that was observed by the social worker, R.P., then age 5, placed an extension cord into an uncovered electrical outlet in a wall. When the social worker encouraged mother to redirect R.P.'s behavior, Mother referred to R.P. as "the bad child."

K.J. had reported to the Agency that during December 2020, Mother had left her home during visitation, leaving N.W. to supervise Minors and Mother's six-month-old baby. K.J. reported that on Mother's return she had expressed to Mother that the children should not be left alone. But later, at a Child and Family Team meeting where Mother was present, K.J. said she had no worries about the children being left alone in Mother's home, and was not aware that Minors had been left to be cared for by N.W.

The Agency could not determine the extent to which Mother had been participating in independent living and parenting support services. Mother reported that the providers visited her home consistently during the reporting period, but the providers indicated otherwise. Ms. Ward had been on leave in October, November and December 2020; her last in-person contact was at the end of September, at which time she had observed scheduled visitation at Mother's home. Ms. Ward stated that at the visit, Mother appeared overwhelmed in managing the children's needs. The coordinator who had been working with Mother in Ms. Ward's absence, Ms. Freeman, had met with Mother in person at least once in late November 2020. The Agency encouraged mother to reach out to her network and the Regional Center providers for additional support of her visitation program.

Minors were happy living with K.J. and visiting with Mother. N.W., however, who was then 15 years old, wanted to return to Mother's care. At

times, when N.W. felt the need to "take a break" from her siblings and K.J., she would leave K.J.'s home and go to Mother's.

The Agency expressed concern that Mother appeared overwhelmed during visits, relied on "yelling" at the children to redirect their behaviors, and had not progressed to overnight visitation. The Agency also expressed concern about the status of Mother's housing, and concern that Mother had not shown she could make use of her identified network in meeting her children's needs. Although Mother had acknowledged that the children required supervision to make sure they are safe and not exposed to hazardous situations, the Agency was concerned that Mother appeared "fixated" on R.P.'s August 2019 near-drowning, which she continued to blame on the child himself, and had not recognized the need to support her children's safety in all settings, including her home. Mother referred to R.P. as the "busy or bad" child.

At a hearing on February 3, 2021, the court set the matter for a contested hearing.

2.     *Addendum Reports Filed on March 19 and April 30, 2021*

The Agency prepared addendum reports in advance of the contested hearing, which was held on May 3, 2021.

The Agency reported on some positive developments: Mother's rental fees had been paid in full and Mother had completed the necessary documents to apply for emergency rental assistance; in February 2021, Mother's visits with the children had increased in length to eight hours each; and Mother was participating in virtual parenting education with in-person follow ups that appeared to Mother's instructor to be helpful.

The Agency reported concerns about Mother's ability to supervise the Minors and control her anger and frustration. In late February 2021, the

13

social worker went to Mother's home to observe visitation, having confirmed by phone that a visit would be observed and providing a text reminder the day before the visit. R.P. opened the door for the social worker without permission. The worker stayed outside until Mother gave permission for her to enter; Mother appeared frustrated that the social worker was there. Mother yelled at R.P. and T.P., telling them not to open the door, berating them for having done the same thing at K.J.'s home, and telling them that if they didn't return to her home (at the conclusion of the dependency proceedings) it would be their fault. The social worker tried to redirect Mother to give the children safety reasons why it was not a good idea to open the door. Mother continued to yell and use profanity, and "was unable to contain herself" in the presence of the children and the social worker, to such an extent that the social worker left.

While K.J., the caregiver with whom the children had continued to live, was traveling out of state for about 10 days in early March 2021, Minors and N.W. were placed together in a different home.[7] The temporary caregiver reported that Mother had spoken to her over the phone and started to yell and curse at her to the point that the caregiver asked to hang up.

---

[7] On March 3, when the social worker spoke by phone with K.J. to confirm the arrangements for respite care, K.J. informed the social worker that N.W. would not have her phone with her because Mother had broken it a few days before, when she became angry with N.W. for not watching the other children. On March 11, N.W. told the social worker that she had broken the phone herself by dropping it, but on March 17, Mother and N.W. admitted that Mother broke the phone when she became upset with N.W. Mother said she had become upset when she saw an inappropriate post on social media. She broke the phone even though she knew that N.W. used the phone to complete school assignments.

14

On March 14, 2021, a different social worker went to Mother's home to observe visitation. Mother began speaking about the assigned social worker and became upset; the social worker asked Mother to step outside "in efforts to help regulate the mother in order to continue to observe the visit." The visit did continue, and at one point, R.P. grabbed a cord on a fan. Mother yelled at R.P. to leave it alone, and told the social worker that R.P. is her wild child and she always had to tell him multiple times not to do things he shouldn't.

On March 17, 2021, K.J. gave the Agency a 14-day notice for all the children, indicating that she was no longer willing to provide their care. K.J. stated that the previous day, March 16, N.W. had intervened in a conflict between K.J. and one of K.J.'s two granddaughters (who also lived with K.J.), which led to an argument between K.J. and N.W. According to the agency, "Neither individual was able to contain themselves," with the result that K.J. asked N.W. to spend the night at Mother's home; then Mother made threats to K.J. over the phone that someone would harm K.J. as a result of N.W. leaving the home and "the ongoing conflicts."[8] K.J. reported to the Agency that Mother had left N.W. alone to supervise Minors and Mother's then 8-month-old baby, and that in her view Mother's choices concerning men living in her home was a distraction to Mother's ability to care for her children.

Starting in late March 2021, Mother had much less visitation with her children. On March 27 and 28, and again on April 2 and 3, Mother visited with the children but did not keep them for the full eight hours. Mother told K.J. the children were "acting up" and asked that they return to K.J.'s home. Then, on April 4, Mother informed K.J. that she was leaving town; there was

---

[8] There had apparently been ongoing arguments and conflict between Mother and K.J. since September 2020.

no visitation between then and May 3, 2021, the date of the contested hearing (at which Mother appeared by video). On April 8, Mother left a voicemail for the social worker stating that she was dealing with an urgent family matter that required her to travel to Kentucky. On April 15, Mother informed the social worker in a phone call that she would return to California on April 25. The social worker left a voicemail for Mother on April 26 and spoke with Mother by phone on April 29: Mother stated she had been dealing with car and phone issues that had prevented her from returning to California, but she was planning to return in the next few days. At the May 3 hearing, the Agency's counsel reported that the best information they had was that Mother was still out of state.

Mother continued to receive 35 hours per month of independent living skills support and 20 hours per month of parenting support, including in-home services. Ms. Ward, Mother's independent living skills coordinator, stated in March 2021 that Mother's parenting goals remained unchanged since the last reporting period because Mother had not made enough progress toward the goals. The Agency attached an independent living skills annual report and a parenting annual report, both dated March 4, 2021 and prepared by Le Blanc. The independent living skills report stated that Mother had found affordable housing and shown "improvement with mealtime and cooking full meals," and continued to need assistance in multiple areas including learning time management and keeping her appointments with Le Blanc staff; budgeting and paying bills on time; "communication with professionals in an appropriate [manner] keeping herself calm"; learning to set and keep medical and dental appointments; "learning to maintain healthy relationships without verbal outbursts"; "learning that it's ok to have differences of opinions and discussions without

16

chaos"; learning proper food storage and kitchen safety techniques; learning emergency procedures and contact information; and creating an evacuation plan.  The parenting annual report stated that Mother needed support with communication with her children's doctors and teachers, with learning to set and keep the children's medical and dental appointments and keeping their immunizations current.  Mother would continue receiving support and assistance with learning organizational skills to maintain her living space.  Safety and community awareness remained a goal for Mother:  Le Blanc would "continue to support the client with education and instruction on safety awareness in the home:  keeping cleaning supplies put away, not opening the front door, keeping sharp objects away from children's reach."  In addition, Mother would "continue to receive assistance with learning to keep her children safe when at outings and events in the community, keeping them within her eye sight and reach at all times, and providing another adult to assist her when on outings."  And she would "continue to receive assistance with learning emergency procedures with injuries, poison control, and first aid."

The Agency concluded that Mother had not demonstrated that she could meet the children's needs for safety and supervision, despite 18 months of services facilitated by the Regional Center.  The agency also expressed concern that Mother's struggle to regulate her emotions and behavior were harmful to the children's safety and well-being, as well as destabilizing to the children's placement.

In light of the 14-day notice given by K.J., who had been caring for N.W. and the Minors since February 2020, the Agency revised its February 2021 recommendation.  Rather than recommending K.J. as guardian, the Agency recommended that another living arrangement be made with the goal

of legal guardianship.[9]  Mother continued to disagree with the recommendations; she wanted the children returned to her care.  N.W. also disagreed with the recommendations and wanted to be returned to her Mother's care.  Minors continued to report the desire to live with K.J. and visit with Mother.

3.      *Contested Hearing – May 2021*

At the May 3, 2021 contested hearing, the Agency rested its case-in-chief after the court admitted the Agency's reports into evidence.  The children's counsel submitted with the statement that her clients wanted to be returned to Mother.  Mother called Ms. Ward as her single witness.

Ms. Ward testified that she had been Mother's independent living skills worker for about two years.  She testified that Mother could receive Le Blanc's services indefinitely:  as long as she continued to be a client of the Regional Center, she would be a client of Le Blanc.  The services were voluntary, and Mother did not have to participate if she did not want to do so.  Ms. Ward said that it was "a struggle getting [Mother] to participate when we first got her for a client," but that began to change a couple of months in, when Ms. Ward showed up at court with her in connection with the criminal case arising from the near-drowning incident.

With respect to "Safety and Community Awareness," which were identified as goals in Le Blanc's independent living skills and parenting annual reports, Ms. Ward explained that safety awareness had been a goal since she had started working with Mother, and it remained a goal especially now that Mother had her own apartment.  Safety awareness training

---

[9] As of a March 2021 Child and Family Team meeting, the children were to remain with K.J. while one of the children's relatives was being assessed for placement.

included things like keeping cleaning supplies put away from the children, putting locks on cabinet doors, and being aware of her surroundings in public.

Ms. Ward testified that Mother's goals had not been updated or changed between September 2020 and February 2021. The reports, she explained, "state[ ] what we're continuing to work on with the client." New goals could be added, "[b]ut if they're continuing to work on the same things, then that's what . . . we put there. We put what they have been working on and what they will continue to work on." When Mother's counsel asked Ms. Ward whether she had seen progress from Mother on her goals between September 2020 and February 2021, Ms. Ward responded, "Um, I don't know how much. That's just a couple of months. So I've seen progress that she's made during the time that I've been working with her, but as far as just within these couple of months, I know that she's, you know, communicating more. She's trying. She's—she started going to—you know, attending the parenting classes. She even called me and asked me to remind her; can I call her and remind her right before the class starts. That's how much she's trying to work on these things. I feel like that's progress, you know, within just these couple of months that she's really trying to, you know, take care of her responsibilities, and do what she's supposed to do, if that's what you're asking."

Ms. Ward testified that in 2021 she had seen mother once a week in person at Mother's home, staying about three hours each time. In 2020 and 2021 she had in-person contact with Mother at least four times during Mother's visitation; she had been present in the home when N.W. and Minors were there, and had not observed N.W. assisting with the care of Minors or the baby.

19

According to Ms. Ward, Mother had made progress in managing her frustrations: she was getting better at communicating, even if she was crying, and was less often "just blowing a fuse." She stated that a specific trigger for Mother was becoming "overwhelmed with having to have so many different visits" from different service providers, including the social worker and providers from Le Blanc. She had seen Mother "emotionally escalated," where she was upset and frustrated, and had seen her getting frustrated with the children and yelling at them, but had never seen Mother hit any of the children.

After Ms. Ward testified, the court heard argument.

Mother's counsel argued that the court should return all the children to Mother immediately, or alternatively, return N.W. immediately and continue reunification services for Minors to the 24-month mark.

The children's counsel said that she shared the Agency's concerns regarding Mother's ability to parent. Mother had not been able to demonstrate that she could use the services she had received in her daily interaction with the children. Mother's ability to care for the children remained at issue. The children's counsel thus could not agree that the children should return to Mother's care.

After argument, the court explained that the question was whether all the children could return to the home because there was no substantial risk of detriment, whether just N.W. (then 15 years old) could return because there was no substantial detriment to her, or whether none of the children could return because of the substantial risk of detriment. As to the possibility of continuing services, the court stated, "I don't know what the basis would be for extending services to 24 months, which would just be three months from now anyway or so. . . . [I]t's not as if reasonable services have

20

not been offered. They have. . . . [T]he Regional Center continued to infuse services into mother's life, whether they be virtual and/or in-person even during the pandemic." The court expressed concern that Mother continued to talk about R.P., the child who almost drowned, as "just busy" and "a bad kid," as if "this is his fault," and not taking responsibility for "the part of this that is hers, which when you have a child that young, it's all yours. It's your responsibility to supervise your children." And the court expressed concern that as recently as March, when R.P. opened the door for the social worker, Mother told the children that if they were not returned to her it would be because of them.

The court announced its decision at a hearing on May 11, 2021. The court noted that N.W. would turn 16 in a few months, and was able to care for herself to the extent that there was not a substantial risk of detriment to her and ordered her returned to Mother's care with family maintenance services. But as to Minors, then age 7, 6, and 4, the court found that their return to Mother would create a substantial risk of detriment to their safety, protection, or physical or emotional wellbeing. In part, that finding was based on Mother not making substantial progress in complying with the case plan and not alleviating or mitigating the causes necessitating out-of-home placement. The court terminated reunification services and set a hearing to select a permanent plan for Minors under section 366.26. Mother's petitions timely followed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

As provided by section 366.22, within 18 months of a child being removed from his or her parent's care, the dependency court "shall order the return of the child to the physical custody of his or her parent . . . unless the

21

court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) The Agency has the burden of establishing that detriment. (*Ibid.*) A showing of detriment does not " 'mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)

In making its findings, the dependency court is to "review and consider the social worker's report and recommendations and . . . the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself of services provided." (§ 366.22, subd. (a)(1).) If the child is not returned to his or her parent, the court must "specify the factual basis for its conclusion that return would be detrimental." (§ 366.22, subd. (a)(2).)

Under section 366.22, " 'if a child may not safely be returned to the child's parents within a maximum of 18 months from removal from the parents' care, the trial court must terminate reunification efforts and set a section 366.26 hearing.' " (*In re Andrew L.* (2004) 122 Cal.App.4th 178, 190-191.)

We review dependency court orders under section 366.22, subdivision (a), for substantial evidence, considering the evidence in the record favorably to the prevailing party and resolving all conflicts in support of the trial court's order. (*Yvonne W.*, *supra*, 165 Cal.App.4th at pp. 1400-1401.)

" 'Substantial evidence' means evidence that is reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case.' " (*Id.* at p. 1401.)

B.      *Analysis*

There was substantial evidence before the dependency court to support its finding that returning Minors to Mother's care would create a substantial risk of detriment to Minors' safety, protection, or physical or emotional well-being. (§ 366.22, subd. (a).)

Minors came to the dependency court's attention because Mother left her children unattended at a swimming pool when none of them knew how to swim. This happened on two consecutive days, and on both days one of the children nearly drowned. In addition, the children reported other incidents of near-drowning. Further, the record reflects that Mother's school-age children did not attend school regularly while under Mother's care, and that both T.P. and R.P. had extensive untreated dental decay, and that neither R.P. nor A.P. were up-to-date on their immunizations. All of this reflects Mother's inability to adequately supervise Minors. Appropriately, then, starting with the six-month review, the primary goal of the case plan was that the children's caregiver could "provide supervision, attend to their needs, and [be] able to assess potentially hazardous situations (preventing drowning) to ensure physical safety of the children."

The dependency court's decision to terminate reunification services was made in the face of substantial evidence that, despite the services that had been provided, Mother could not adequately supervise Minors, three very active children aged 4 to 7, or assess situations that were hazardous to them. As a result, returning them to her care would pose substantial risk to their physical safety and well-being.

23

The evidence included the fact that after more than a year of services, Mother had not progressed to overnight visits. Even more important, after Mother's visits with Minors were increased from four to eight hours in February 2021, Mother showed herself unable to supervise Minors during the extended visits. In the week before her abrupt April 4, 2021 departure from California, Mother cut short four visits because she could not manage the children "acting up," and she had not seen them at all in the month preceding the contested hearing.

There was further evidence in Mother's independent living and parenting annual reports and the testimony of Ms. Ward. Mother's goals, including those pertaining to family safety and community awareness had not changed from September 2020 to February 2021. Mother continued to need instruction on safety awareness in the home, and she needed to learn to keep her children safe on outings and in the community, to keep them within her sight and reach, as well as learning emergency procedures with respect to injuries, poison control and first aid.

There is more evidence in Mother's apparent failure to recognize the hazards associated with a small child grabbing a cord attached to a fan, or plugging in an extension cord, or opening the front door without permission. Her response to those situations was to criticize Minors, rather than recognizing her responsibility for supervising and instructing them.

In addition, there was evidence that Mother continued to require her older daughter N.W. to supervise Minors, even after the events that led to the dependency proceedings. Although K.J. retracted one of her statements about Mother leaving N.W. to care for her younger siblings, and although Mother denied that she had done so, the dependency court could have concluded K.J.'s original statement was true. K.J.'s retraction was made at a

meeting where Mother was present; as the Agency observes, in light of "Mother's tendency to become emotionally escalated and confrontational, and [K.J.'s] interest in minimizing conflict with Mother, it is not surprising that [K.J.] changed her story." In addition, K.J. later reported that Mother had broken N.W.'s phone in anger over N.W. not watching her siblings. Mother points out that "[s]upervising younger siblings, *within reason*, is what elder siblings *do*, particularly in large families." (First italics added.) True, and the reasonableness of such supervision depends upon the circumstances. Here, there was evidence that Mother herself could not adequately supervise Minors. Two adult caregivers (K.J. and the substitute caregiver with whom Minors stayed in March 2021) reported challenges in supervising Minors, particularly in regard to R.P. and A.P.'s rough-housing, fighting, and kicking. K.J. reported that N.W. often had difficulty concentrating and completing tasks, and appeared "confused" when given directions, and N.W. herself had expressed concern about having responsibility for her siblings. In these circumstances, the dependency court could conclude that leaving Minors under N.W.'s supervision was evidence of Mother's failure to adequately supervise Minors, and evidence that returning Minors to Mother's care would expose them to substantial risk to their safety and physical well-being.

Minors' safety and physical well-being were not the only risks from returning Minors to Mother's care. There was evidence that Mother's inability to take responsibility for supervising Minors and her blaming them for the results of her lack of supervision created substantial risk of detriment to their emotional well-being. Mother failed to acknowledge her own responsibility for supervising her children: she persisted in blaming R.P. for the near-drowning, continued to refer to him as a "bad child," and told T.P. and R.P. it would be their fault if they did not return to her. As the

25

dependency court remarked at the contested hearing, Mother's "lack of insight is really disturbing and does create emotional straining for children, that they carry for the rest of their lives if they feel like they're responsible for what would be considered the wors[t] thing that ever happened in their lives, when the mother's lack of supervision and support is what caused the problem in the first place."

Mother argues that she participated regularly and made substantive progress in reunification services. Mother's efforts are to be commended: she persevered with reunification services in the face of her developmental disability, the COVID pandemic, the birth of her seventh child, and the challenges of interacting with multiple service providers. And we recognize that Mother made some progress: Mother found stable housing, and, according to Ms. Ward, was learning to manage her frustrations and communicate with her service providers. Despite Mother's efforts, however, there was ample evidence to support the dependency court's findings that Mother's progress had not been substantial; that the issues that brought the case to court had not been resolved; and that returning Minors to Mother's care created a substantial risk of detriment to their safety, protection, or physical or emotional well-being.

## DISPOSITION

The petitions are denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.450(a), 8.490(b)(2)(A).)

26

_____

Miller, J.

WE CONCUR:

_____

Kline, P.J.

_____

Richman, J.

A162641, *L.W. v. Superior Court*